# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 20-609

**STATE OF LOUISIANA**

**VERSUS**

**CURTIS ROY WILLIAMS**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 18365-18
HONORABLE DAVID RITCHIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## VAN H. KYZAR
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, Van H. Kyzar, and Sharon Darville Wilson, Judges.

**AFFIRMED**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P. O. Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Curtis Roy Williams**

**Stephen C. Dwight**
**14th JDC District Attorney**
**John E. Turner**
**Assistant D.A. 14th JDC**
**P. O. Box 3206**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**KYZAR, Judge.**

Defendant Curtis Roy Williams appeals his convictions and sentences for second degree battery and battery of a healthcare provider producing injury. For the reasons herein, we affirm the convictions and the sentences imposed.

## FACTS AND PROCEDURAL HISTORY

Curtis Roy Williams was charged by Bill of Information filed on October 15, 2018 with second degree battery, asserting that on or about August 14, 2018, he committed a battery and intentionally inflicted serious bodily injury upon Kimetha Michelle Smith without her consent, in violation of La.R.S. 14:34.1. Within the same instrument, he was charged with battery of a healthcare professional producing injury, also occurring on August 14, 2018, by committing a battery upon an emergency room personnel, emergency service worker, or a healthcare professional, that produced an injury that required medical attention, in violation of La.R.S. 14:34.8(A) and (C)(2).

Counsel for Defendant filed a motion for the appointment of a sanity commission on September 28, 2018, alleging Defendant was not competent to proceed to trial. That motion was denied after a sanity hearing on November 7, 2018. A second motion to appoint a sanity commission, again alleging Defendant lacked the mental capacity to proceed, was filed January 22, 2019. In that motion, defense counsel contended that Defendant's mental health had deteriorated since the November 7, 2018 hearing. A second sanity commission composed of Drs. James Anderson and Patrick Hayes was appointed, and Defendant's motion was denied following a hearing on March 27, 2019.

On June 25, 2019, Defendant appeared in court and withdrew his plea of not guilty and substituted a plea of not guilty and not guilty by reason of insanity as to each of the offenses charged. Trial by jury commenced on November 13, 2019.

At trial, the State called as its first witness Sergeant Roland Jones of the Calcasieu Parish Sheriff's Office. Sergeant Jones noted he was working as a detective in the Crimes Against Persons Unit at the time the incident in question occurred on August 14, 2018, and that he was called out to Christus Saint Patrick Hospital to investigate an injury to a nurse. Upon his arrival at the hospital, he was informed there was video footage of the attack, which he obtained from the hospital.

The video is roughly four and a half minutes long and was played for the jury. Therein, at approximately the forty-five second mark, Defendant can be seen trying to pull his arm away from nurse Kimetha Smith, who was attempting to draw blood from Defendant. He then jumps out of bed and punches Ms. Smith, who falls to the floor. Defendant then begins to attack her on the floor. Ms. Smith's colleagues pulled Defendant off Ms. Smith three times, with him immediately returning to inflict more damage each time. After the third time he is pulled away, Defendant goes into the bathroom and other nurses render aid to Ms. Smith. The entire attack lasts around thirty seconds. After Ms. Smith is removed from the room, Defendant returns to sitting on his bed, seemingly calm but repeatedly pointing to the arm from which Ms. Smith was attempting to obtain blood whenever anyone speaks to him.

Sergeant Jones further testified that he had an occasion to listen to a jail call in which Defendant described to the party on the other end of the call why he was incarcerated. The audio of this call was introduced into evidence. Roughly thirty-five seconds into the fifteen-minute call, Defendant tells the other person he is in jail for second degree battery because he "beat up a little bitch at the hospital." When asked if Ms. Smith was okay, Defendant responded "Man, that little girl probably fucked up." Later in the audio recording, Defendant stated he was "hoping to go to the crazy dorm for about a month, you know what I'm saying, trying to get my mind right." Further in the conversation, Defendant stated he "kinda feel bad for that

2

hoochie too, man, I knocked that ho out." When asked why he checked himself into the hospital just to attack a girl, Defendant stated he "woke up on that bullshit" after drinking the night before.

Miles Watts, a registered nurse at the hospital, testified for the State. Mr. Watts stated that he was working in the emergency room on August 14, 2018, and that Defendant was in the patient overflow area of the emergency room while nurse Smith was attempting to draw Defendant's blood. Mr. Watts testified he and his manager heard Defendant yelling and were heading towards him when he pulled the IV out of his arm, threw it on the floor, and attacked Ms. Smith. It appeared to Mr. Watts that Ms. Smith was unconscious when she hit the floor. Mr. Watts first attempted yelling at Defendant to attempt to divert his attention away from Ms. Smith, but he was eventually forced to pull on Defendant's gown multiple times to get Defendant to stop attacking Ms. Smith.

According to Mr. Watts, hospital personnel were able to get Defendant to calm down and sit on his bed after they removed Ms. Smith from the area. When shown the video of Defendant sitting on his bed and repeatedly pointing to his arm while speaking to someone, Mr. Watts testified that Defendant was telling them he did not want to be stuck in the arm.

On cross-examination, nurse Watts stated that he had previously encountered Defendant in the behavioral health area of the emergency room before the August 14, 2018 incident, but did not recall why Defendant was there or seeing Defendant get violent.

The State then called Kimetha Smith to testify. Ms. Smith noted that although she is still technically employed as a registered nurse, she has not worked since the day Defendant attacked her. She noted that on the morning of the incident, a psych nurse informed her that she had woken Defendant up and that he was aggravated.

3

Ms. Smith testified the doctor then asked her to draw Defendant's blood to test his blood alcohol level. She testified she typically starts an IV to avoid having to repeatedly stick a patient while waiting for the patient's blood alcohol level to drop. Ms. Smith testified Defendant was being difficult, stating he refused to let her draw blood from his right arm and insisted she draw from his left arm but then was making it difficult to draw from his left arm.

Ms. Smith testified Defendant did not flinch or react when she inserted the IV but that when she attempted to secure the IV to his hand Defendant pulled it out and flicked it at her. Ms. Smith stated she turned away to avoid the blood on the IV and when she turned back to Defendant, he punched her in the jaw. Ms. Smith testified she fell against the bed behind her, heard someone screaming at Defendant to stop, then felt him hitting her repeatedly in her head, which was bouncing off the floor. Ms. Smith could not state whether she was unconscious at any point during the beating but noted she did not remember being carried away by her coworkers.

Ms. Smith testified she was immediately sent for a CAT scan as well as for X-rays of her wrist. She testified her face and forehead were swollen from the attack, her lip was busted, her jaw was injured, and she had to have two teeth removed. Ms. Smith also testified she sometimes loses feeling in two of the fingers on her right hand, has required physical therapy, and is still receiving counselling due to the attack.

On cross-examination, Ms. Smith testified that she knew Defendant was a mental health patient but that her first interaction with him was when she attempted to draw his blood. She stated, however, that she did not know why Defendant was classified as part of the psychiatric portion of the hospital when she first interacted with him.

4

Defendant's first witness was Sergeant Brian Batchelor, a shift supervisor for the Calcasieu Parish Sheriff's Office, who, on August 14, 2018, was a field training officer for the sheriff's office. Sergeant Batchelor testified that he was called in to investigate Defendant's attack on Ms. Smith at Saint Patrick's by another officer who was already at the hospital due to an order of protective custody (OPC) for another individual. Sergeant Batchelor testified that he had met Defendant previously when he was called out on an OPC for Defendant. According to Sergeant Batchelor, on that occasion, Defendant had laughed when Sergeant Batchelor informed him that he had to go to the hospital but was otherwise compliant. Sergeant Batchelor noted that on that previous occasion, Defendant had admitted that he had smoked some synthetic marijuana. Later, at the hospital, Sergeant Batchelor found synthetic marijuana in Defendant's sock, and Defendant just laughed and said, "Ha, ha. I told you I had synthetic."

Sergeant Batchelor testified that he had not formed an opinion about Defendant's mental health because he did not "have any kind of medical background." He stated that "based on previous instances with him being on synthetic marijuana, his behavior is consistent with people being on synthetic marijuana." Sergeant Batchelor acknowledged that when he arrived on the scene, Defendant was already in handcuffs and under arrest.

The defense then presented to the jury a video taken by Sergeant Batchelor's body camera. The video begins with Sergeant Batchelor approaching the hospital. At about the 2:30 mark of the video, a member of the hospital's security tells Sergeant Batchelor that Defendant has been at the hospital a number of times and that on at least one prior occasion, while in the psychiatric ward, he attacked someone. Upon seeing Defendant, Sergeant Batchelor exclaimed, "You? God damn son, I just put you in the hospital last month." Defendant began laughing when

5

Sergeant Batchelor asked him if he had any drugs in his sock this time. As Defendant was being escorted out, Sergeant Batchelor told him, "Don't try nothing stupid, Curtis."

After leaving Defendant in his unit with another officer, Sergeant Batchelor returned to the hospital and began speaking with the two nurses who were present when Defendant attacked Ms. Smith. Sergeant Batchelor told them Defendant needed to be in a twenty-four-hour care facility because "this is every time. He always wants to fight with somebody." Sergeant Batchelor then told someone else that Defendant needed to be in a "mental facility for the rest of his life." After speaking with the nurses, Sergeant Batchelor called someone to ask if they were familiar with Defendant, telling them "Always OPC, always violent. Always." Sergeant Batchelor also informed the individual he was speaking to that Defendant "was not in his right mind to talk to you." While speaking to one of his superiors to update him on the situation, Sergeant Batchelor again states "You can't really talk to Curtis because he's not all there." The nurses subsequently informed Sergeant Batchelor that Defendant was admitted for hearing voices and that he intentionally stuck his hand in the used needle bin while in the ambulance. The audio was turned off on the video recording at roughly the 32:30 mark.

Sergeant Batchelor noted that although he remembered struggling with Defendant the first time he encountered him, he still felt Defendant's issues were largely due to long-term synthetic marijuana use. He also stated that he was not a psychiatrist. When asked whether he often deals with people with mental health disorders, Sergeant Batchelor stated that he went through CIT training after this incident and he was taught synthetic marijuana use often mimics the symptoms of certain mental health disorders. Sergeant Batchelor testified that "unless I were to

6

actually go to school for it, and actually sit down, I -- I couldn't tell you the difference between mental health disorder and synthetic."

On cross-examination, Sergeant Batchelor testified Defendant's behavior on the occasion in question mimicked the way he was behaving the first time they interacted, when Defendant was on synthetic marijuana. He testified Defendant was compliant and answered all of his questions without incident. Sergeant Batchelor clarified that when he stated on the video that Defendant was "not in his right mind," it did not mean he was crazy, it simply meant he likely had drugs or alcohol in his system. He also confirmed that he has had prior contacts with synthetic marijuana users claiming to hear voices.

At the conclusion of the State's cross-examination of Sergeant Batchelor, the trial judge asked the witness to explain the acronym CIT that he mentioned in earlier testimony. Sergeant Batchelor informed the jury that CIT training is a week of training with psychiatrists, psychologists, and counselors who help the participants identify long-term drug use or mental health issues when dealing with individuals. He then clarified he had no evidence regarding whether Defendant was on drugs on August 14, 2018.

The defense then called Ms. Rose Williams, Defendant's mother, to the stand. Ms. Williams testified that when Defendant was younger, she took him to see a psychiatrist named Dr. Murphy who diagnosed Defendant with attention deficit disorder (ADD). She testified that another psychiatrist, Dr. Buttross, diagnosed Defendant as autistic, although "[n]ot the full-blown way." Ms. Williams testified that she has contacted the coroner's office numerous times because Defendant "was losing touch with reality at home, talking out of his head, having mood swing [sic]." She recalled one occasion where Defendant was convinced the military was after

7

him and people were spying on him, eventually tearing a light fixture out of the wall looking for a non-existent camera.

Ms. Williams also noted Defendant would often speak non-sense, talking and laughing to himself. She recounted that Defendant had spent about nine months in a mental hospital in East Feliciana Parish after being committed. She then testified that Defendant has previously had episodes where he was unable to tell the difference between right and wrong. Finally, she stated she was not home when Defendant went to the hospital on August 14, 2018, and, therefore, she did not know what happened at the time of the incident.

On cross-examination, Ms. Williams acknowledged that there were times when Defendant knew right from wrong, and he simply chose to do wrong. She testified she did not understand Dr. Patrick Hayes's evaluation that drug and alcohol abuse directly impacted Defendant's behavior, although she acknowledged knowing Defendant used drugs. The defense rested following Ms. Williams's testimony.

The State then recalled Ms. Smith on rebuttal, and she noted the reason she was doing an IV on the morning Defendant attacked her was because his blood alcohol level was too high for him to be admitted for mental health problems.

On November 14, 2019, the jury returned a unanimous verdict of guilty as to each count. Counsel for Defendant thereafter filed a motion for a new trial, which was denied on February 27, 2020. The following day Defendant was sentenced to serve eight (8) years in the custody of the Louisiana Department of Corrections on the conviction for second degree battery, with credit for time served. He was further sentenced on the conviction for battery of a healthcare professional producing injury to serve five (5) years in the custody of the Louisiana Department of Corrections, with credit for time served, with three (3) years to run concurrently with the charge of second degree battery, but with two (2) years to run consecutively. The Court

8

recommended that Defendant be screened for a mental health evaluation while incarcerated. Defendant's Motion to Reconsider Sentence was denied on March 10, 2020.

In this appeal, Defendant asserts three assignments of error, which are detailed as follows:

I. There was insufficient evidence to convict Curtis Williams of the two battery charges because the Defense met its burden to prove by preponderance of the evidence that Curtis was insane at the time of the offenses.

II. The trial court impermissibly interjected itself into the case by asking a key witness to explain part of his testimony again, "in fairness to the jury." The court's question clearly implied the jury was missing a crucial piece of information to determine the credibility of the police officer's testimony on the issue of insanity versus effects of synthetic marijuana use. This was a fundamental due process violation by the trial court, which can be reviewed by this Court despite the lack of a contemporaneous objection.

III. The trial court's maximum sentences for a first-time felony offender suffering with mental health problems were excessive and should be reversed.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are none.

## DISCUSSION

*Sufficiency of the Evidence and Proof of Sanity*

Defendant first asserts that there was insufficient evidence for the jury to convict him of the two battery charges, arguing that the defense met its burden to prove by a preponderance of the evidence that Defendant was insane at the time of the offenses. We disagree.

9

"If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility." La.R.S. 14:14. A rebuttable presumption exists under our law that a "defendant is sane and responsible for his actions." La.R.S. 15:432. "Insanity is an exculpatory fact which constitutes an affirmative defense" and "[d]ue process does not prohibit placing the burden of proving an exculpatory fact on defendant." *State v. Thompson*, 429 So.2d 862, 865 (La.1983) (citing *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002 (1952)). At trial, "[t]he defendant has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence." La.Code Crim. P. art. 652.

Our appellate standard of review in this case as to the sufficiency of proof of insanity was succinctly set forth by the supreme court in *State v. Williams*, 07-1407, p. 8 (La. 10/20/99), 22 So.3d 867, 876, *cert. denied*, 560 U.S. 905, 130 S. Ct. 3278 (2010).

> In reviewing a claim for insufficiency of evidence in an action where the affirmative defense of insanity is raised, the appellate court, applying the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorably to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. *State v. Peters*, 94-0283, p. 8, 643 So.2d at 1225; *State v. Armstrong*, p. 4, 671 So.2d at 309; *State v. Nealy*, 450 So.2d 634, 639 (La. 1984).

Defendant admittedly did not call or rely on any mental health experts at trial but argues that he met his burden of proof of insanity by a preponderance of the evidence by the mere circumstances of the offense and testimony of the lay witnesses. He asserts that his insanity was proven by evidence that he was in the hospital that day because of a mental health episode and that hospital personnel

10

reported to the police after the incident that Defendant told them that he was "hearing voices" before this incident. A psych nurse was observing him at the time of incident, in the area reserved for behavioral issues. Defendant further argues that his insanity is established by evidence that he did not attempt to flee after the incident and that he walked to the bathroom "laughing," which his mother testified he occasionally did after experiencing a psychotic episode.

The State on the other hand points to the evidence showing that Defendant knew where he was, having checked himself into the hospital, and that the victim, nurse Smith, had been informed that Defendant expressed agitation during an attempt to place an IV into his arm. In fact, Defendant requested that nurse Smith place the IV into his other arm, reflecting lucid thought on his part. The video of the beating incident shows Defendant pointing to his arm after he was subdued, as if to provide a justification of his actions, also evidencing his understanding of right and wrong. Also, although Defendant was laughing after the incident, he quickly stopped when told by an officer that the incident was no laughing matter, further indicating an understanding and awareness of right and wrong.

In addition, the jury heard the recording of a jail call dated August 17, 2018, wherein Defendant admitted that he "beat that little bitch at the hospital[]" and stated "I kinda feel bad for that little hoochie. I knocked that ho out." The State asserts this statement provides an acknowledgement that Defendant knew right from wrong at the time and that even days after the incident, he clearly remembered the events that transpired that day. The State contrasts this evidence with the testimony from Defendant's mother that in the event of a psychotic episode, Defendant does not remember anything afterward. In that he clearly recalled the incident in question, the State argues the jury could easily have rejected Defendant's claims and determined he was not insane at the time of the offense.

11

Undoubtedly, Defendant has experienced some mental issues and has been treated for such in the past. He has likewise had issues with substance abuse, including the use of synthetic marijuana. While a defendant's voluntary intoxication may be asserted as a defense "[w]here the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime[]" pursuant to La.R.S. 14:15(2), "[i]t is, however, an affirmative defense, and the burden is on defendant to prove by a preponderance of the evidence that he was in fact intoxicated at the time of the offense." *State v. Mack*, 45,552, p. 3 (La.App. 2 Cir. 8/11/10), 46 So.3d 801, 803. No such affirmative defense was pleaded or presented here. Further, the presence of mental defect or disease does not equate automatically to insanity.

> Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, defendant must show he suffered a mental disease or mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question. The determination of sanity is a factual matter. All the evidence, including expert and lay testimony, along with the defendant's conduct and action, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. Lay testimony pertaining to defendant's actions, both before and after the crime, may provide the fact finder with a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense.
>
> In reviewing a claim for insufficiency of evidence in an action where an affirmative defense of insanity is raised, this court, applying the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense.

*State v. Johnson*, 18-523, p. 8 (La.App. 3 Cir. 2/6/19), 265 So.3d 1034, 1042-43, *writ denied*, 19-312 (La. 5/28/19), 273 So.3d 314.

12

Here, there was no expert testimony that Defendant was unable to distinguish right from wrong at the time of the offense. While there was scant circumstantial evidence of mental illness, there was equal, if not more, evidence that Defendant knew what he was doing. The jury heard the testimony of the witnesses for the State and considered the evidence and witnesses for Defendant. As a reviewing court, it is not our role to substitute our evaluations of credibility and weight given to any particular testimony or evidence. We may impinge upon the fact finder's discretion "only to the extent necessary to guarantee the fundamental protection of due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988). There is no such issue here. Thus, we conclude, after viewing all of the evidence in a light most favorable to the state, a rational fact finder could reasonably have determined that Defendant failed to prove that he was insane at the time he battered nurse Smith, causing serious bodily injuries. Accordingly, we affirm Defendant's convictions.

*Witness Questioning by the Trial Court*

Defendant next asserts that the trial court impermissibly interjected itself into the case by asking a key witness to explain part of his testimony again, "in fairness to the jury." He argues that the trial court's question implied the jury was missing a crucial piece of information necessary to determine the credibility of the police officer's testimony on the issue of insanity versus effects of synthetic marijuana use. Despite the lack of a contemporaneous objection by defense counsel at the time, Defendant argues that this was a fundamental due process violation by the trial court, which can be reviewed by this court on appeal.

The complained of questioning came at the close of the testimony of Sergeant Batchelor. During his cross-examination, when asked if he "deal[s] with people with mental health disorders often[,]" Sergeant Batchelor replied that he "went through that CIT training." He explained that he was taught it is difficult to distinguish

13

between someone experiencing a real mental health episode from someone showing the effects of certain narcotics and that a drug user's actions may "mimic" someone who's mentally ill. Sergeant Batchelor stated that he had had a previous encounter with Defendant and had suspected that Defendant had been using synthetic marijuana. During this encounter, Defendant admitted his use of the substance, and Sergeant Batchelor discovered the synthetic substance in his possession at that time. Toward the close of the witness's testimony, the trial judge asked Sergeant Batchelor to explain the CIT acronym, as neither counsel for the State or Defendant had done so.

> THE COURT: Actually, let me just ask you, real quick. You–You had mentioned CIT. All of us know what that means but, in fairness to the jury, it may be what you said, "I've been to CIT training," --
>
> [SERGEANT] BATCHELOR: Oh, yeah.
>
> THE COURT: Just briefly say what that is so they understand –
>
> [SERGEANT] BATCHELOR: It is a –
>
> THE COURT: -- you --
>
> [SERGEANT] BATCHELOR: It is a week-long course in which people from all psych areas around here, whether it be the new one on Nelson, I can't think of the name of it, but each -- each psych place around here, they sent professors from McNeese, and doctors, and they actually go through -- I -- I want to say it's 40 hours, or more, and they help us to determine on how to deal with people who have mental disabilities and how those mental disabilities also mimic the effects of longterm narcotics use. So it helps us to better deal with people out in the public who are on longterm narcotic use or may have mental disabilities. And, in fact, they send us to -- I -- we each go to five different institutions, and we actually interact with people who actually have those mental disabilities. And then, we also go through scenarios, and those scenarios can be anybody who just might be depressed, suicidal, bipolar, or what have you. But we have a full week of interaction dealing with people who actually have mental disabilities.
>
> THE COURT: All right. That's fine. I just wanted you just to explain what CIT was. All right. Thank you. All right. Does ... Do you have any questions in response to that? I just wanted him to clarify what CIT was.

14

"The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted." La.Code Crim.P. art. 772. This provision is referred to as the "no-judge-comment rule". *State v. Thomas*, 12-1458, p. 3 (La.App. 3 Cir. 6/5/13), 114 So.3d 684, 687.

> The no-judge-comment rule is designed to safeguard the role of the jury as the sole judge of the facts on the issue of guilt or innocence. [footnote omitted] *State v. Hodgeson*, 305 So.2d 421 (La.1974) and decisions there cited. Thus, if the effect of a question or comment is to permit a reasonable inference that it expresses or implies the judge's opinion as to the defendant's innocence or guilt, this constitutes a violation of the defendant's statutory right to no-comment and thus requires reversal. *State v. Green*, 231 La. 1058, 93 So.2d 657 (1957). Likewise, any comment or question by the judge expressing or implying his opinion with regard to a material issue is reversible. *State v. Hodgeson*, 305 So.2d 421, 421 (La.1974) (summarizing decisions).
>
> The no-comment rule does not bar a trial judge from asking clarifying questions in the presence of the jury; nevertheless, in the exercise of this power, the judge's questioning must be cautiously guarded so as not to constitute an implied comment. *State v. Nicholas*, 359 So.2d 965 (La.1978). The judge may even question a witness as to a material matter which has been omitted, providing he does so in an impartial manner and conducts his examination in such a way that he does not indicate his opinion on the merits or any doubt as to the credibility of the witness. *State v. Groves*, 311 So.2d 230 (La.1975). See, generally, Joseph, Work of the Appellate Courts in 1974-75 Criminal Trial Procedure, 36 La.L.Rev. 605, 624-26 (1976).

*State v. Williams*, 375 So.2d 1379, 1381-82 (La.1979).

In the instant case, the trial court merely asked a question allowing for the clarification of testimony from Sergeant Batchelor as to the meaning of the potentially unfamiliar acronym, CIT. It did not suggest an answer, comment on the testimony, or suggest in any way an opinion as to the credibility, or lack thereof, of the witness. It did not express an opinion as to the evidence or the ultimate question of guilt or innocence. It did not express or suggest any opinion as to Defendant's

15

sanity at the time of the offense. Thus, we find no merit to the assignment of error and affirm Defendant's convictions.

*Excessive Sentence Claim*

In his third assignment of error, Defendant asserts that the sentences imposed individually and collectively amount to an excessive sentence prohibited by our constitution. "Whoever commits the crime of second degree battery shall be fined not more than two thousand dollars or imprisoned, with or without hard labor, for not more than eight years, or both." La.R.S. 14:34.1(C). "Whoever commits the crime of battery of emergency room personnel, emergency services personnel, or a healthcare professional" producing "an injury that requires medical attention, the offender shall be fined not more than five thousand dollars and imprisoned with or without hard labor for not less than one year nor more than five years." La.R.S. 14:34.8(C). The sentence imposed here is the maximum sentence allowed for each offense.

> On appellate review of sentence, the relevant question is " 'whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.' " *State v. Cook*, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959 (quoting *State v. Humphrey*, 445 So.2d 1155, 1165 (La.1984)), *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). In this context, a trial court "abuses its sentencing discretion *only* when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes 'punishment disproportionate to the offense." ' *State v. Soraparu*, 97-1027 (La.10/13/97), 703 So.2d 608 (quoting *State v. Sepulvado*, 367 So.2d 762, 767 (La.1979)).

*State v. Thomas*, 98-1144 (La. 10/9/98), 719 So.2d 49, 50.

Louisiana courts have laid out the following guidelines with regard to excessive sentence review:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02),

808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La. 6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, 958[, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996)].

*State v. Soileau*, 13-770, 13-771, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005-06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

In *State v. Baker*, 06-1218 (La.App. 3 Cir. 4/18/07), 956 So.2d 83, *writ denied*, 07-320 (La. 11/9/07), 967 So.2d 496, *and writ denied*, 07-1116 (La. 12/7/07), 969

So.2d 626, this court adopted the fifth circuit's three factor test regarding the suitability of sentences from *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183, which established that an appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes.

Pursuant to *Baker*, we first consider the nature of the crimes for which Defendant was convicted. Louisiana Revised Statutes 14:2(B)(6) defines second degree battery as a violent crime. Further, although not explicitly designated a crime of violence under La.R.S. 14:2(B), by its very definition, battery of a healthcare professional producing injury is a violent offense in that it necessarily involves violent actions by the offender producing injury to the victim.

The second *Baker* factor involves a review of the nature and background of the offender. Defendant's arguments as to the excessiveness of his sentences are related to the fact that these are his first felony convictions and that he suffers from mental illness and is in need of treatment. Defendant was twenty-eight years old at the time of the attack on Ms. Smith and was almost thirty when he was sentenced. Defendant has a high school education and does not appear to have any children. During sentencing, the trial court acknowledged that there have been concerns about Defendant's volatility as far back as when he was in elementary school, and that Defendant had been in need of mental health treatment for years prior to the current incident.

Defendant contends his sentences are excessive precisely because he was in need of mental health treatment. However, as noted by the trial court, Defendant has repeatedly failed to take prescribed medication for his mental illness and instead has opted to self-medicate with illegal drugs and alcohol. Defendant also contends his sentences are excessive because he is a first felony offender. While technically

18

true, the State listed thirteen prior misdemeanor offenses, most of which were simple battery charges and were, therefore, violent crimes. Furthermore, as noted by the trial court, a number of those battery charges were ultimately dismissed because the victim was Defendant's mother, Ms. Rose Williams, who would not cooperate with any prosecution.

Finally, *Baker* directs the court to consider sentences imposed in other cases for the same offenses. Initially, we note that La.R.S. 14:34.8, battery of a healthcare professional, was added to the criminal code in August of 2014, and we can find no reported cases involving this offense. However, as noted above, the five-year hard labor sentence Defendant received, two years of which is are to run consecutively to his sentence for second degree battery, represents a maximum sentence. Additionally, the eight-year hard labor sentence Defendant received for second degree battery also represents a maximum sentence.

In *State v. White*, 35,235 (La.App. 2 Cir. 10/31/01), 799 So.2d 1165, the second circuit upheld consecutive maximum sentences for a first offender convicted of simple robbery, conspiracy to commit simple robbery, and second degree battery, all arising out of the same robbery. That court noted:

> During sentencing, the trial court stated:
>
> > This is a heinous crime, one of the worst and unfortunately the District Attorney because of the way laws are written and because of the way the interpretations of the supreme court as to what they could charge you with, you were charged, entered a plea of guilty to the charges of simple robbery, conspiracy to commit simple robbery, and second degree battery. You heard what the lady said, broken jaws on the right side, left side, reconstruction, medical bills that will probably run into the thousands and thousands of dollars that they are going to have to find ways to pay for. It's traumatized not only the wife but the husband as well as their children. . . . But based on what I have seen in this case and what I can do as a judge, the only thing I can do is give the maximum sentence on each charge and I'm going to do that.

19

Examination of the record indicates that the trial court adequately considered all facts, including the presentence investigation. The court obviously felt that the risk to public safety was so great as to justify maximum consecutive sentences. The court's concern was justified under the facts of this case. The victim was viciously beaten, suffering severe and life-altering injuries which continue to plague her. As a result of the brutality inflicted upon this hapless woman, her family has also suffered considerable emotional distress. The defendant asserts that he is not "the worst of the worst," deserving of the maximum penalties. However, the trial court found that the defendant was, in fact, among the worst offenders; based upon this record, we must concur in the trial court's assessment.

The record does not demonstrate that the consecutive sentences imposed are grossly out of proportion to the seriousness of the offenses, or nothing more than a purposeless and needless infliction of pain and suffering. Viewed in light of the harm done to society, the defendant's sentences do not shock the sense of justice.

*Id.* at 1171-72.

In pronouncing the sentences imposed here, the trial court articulated its consideration of the sentencing guidelines of La.Code Crim.P. art. 894.1. Specifically, the trial court determined that there was an undue risk that Defendant would commit another crime if given a lesser sentence, that a lesser sentence would depreciate the seriousness of the crimes committed here, that Defendant is in need of correctional treatment or a custodial environment, and that the crimes committed manifested extreme cruelty to the victim and caused serious bodily injury. Although La.Code Crim.P. art. 883, provides that when a "defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively" the trial court here did expressly provide that some parts of the sentences be run consecutively. It did so on considering Defendant's mental health status stating "[t]he reason I'm -- I am -- the reason I am doing that, because I am, you know, taking into consideration, the -- the defendant's mental illness, and that is a

20

mitigating factor that I am looking at in -- in running some of that time -- those three years concurrent. Otherwise, but for that, I would run the entire sentence consecutive." Further, while recognizing Defendant as a first-felony offender, the trial court noted that it could find no mitigating factors relevant other than Defendant's mental issues.

We find no abuse of the broad sentencing discretion of the trial court. Defendant was found guilty of two separate crimes, though they constituted part of a continuing event. The batteries committed on nurse Smith were extremely violent and protracted. Nurse Smith was beaten about the head and body and kicked in her stomach and sides. She was seriously injured and disfigured, requiring medical attention, hospitalization, and continued therapy. She further suffered post-traumatic stress as a result of the incident and has not been able to return to work. Defendant expressed no remorse following the incident; instead laughing until told by attending officers that this was no laughing matter. Later, in his recorded telephone call, Defendant bragged about beating nurse Smith, referring to her using profane and vile language. That same recorded phone conversation reflects Defendant's callousness and deviousness, shown by statements from which one can draw the inference that he expects that he will get away with his acts because of his asserted mental illness. This reflects conscious thought, a knowledge of right and wrong, and not serious mental illness. The victim in this case did nothing to warrant the vicious attack by Defendant. In fact, she was there in her professional capacity to aid and assist Defendant. She was rewarded by being violently attacked and seriously injured. This record does not demonstrate that the sentences imposed are grossly out of proportion to the seriousness of the offenses. Indeed, the seriousness of the offenses warranted a serious sentence. Thus, we affirm the sentences imposed.

21

## DECREE

For the reasons herein, we affirm the convictions for the offenses of second degree battery and battery of a healthcare worker producing injury requiring medical attention. We further affirm the sentences imposed for each.

**AFFIRMED.**